## COMMONWEALTH *vs.* RAYMOND COLON.

Hampden. February 9, 2007. - May 22, 2007.

Present: MARSHALL, C.J., IRELAND, COWIN, & CORDY, JJ.

*Homicide. Firearms. Constitutional Law,* Search and seizure, Assistance of counsel. *Search and Seizure,* Expectation of privacy. *Due Process of Law,* Assistance of counsel. *Practice, Criminal,* Capital case, Assistance of counsel, Instructions to jury, Argument by prosecutor. *Defense of Others.*

A Superior Court judge properly denied the criminal defendant's motion to suppress statements and physical evidence obtained as a result of the warrantless entry by police officers into the defendant's girl friend's apartment, where the defendant had no reasonable expectation of privacy in that apartment; further, there was adequate probable cause to support a search warrant issued for a later search of the apartment. [212-218]

A criminal defendant failed to demonstrate that his counsel was ineffective in presenting an argument that the defendant was acting in defense of others [218-220], in failing to request a manslaughter instruction on the basis of provocation [220-222], or in failing to request a hearing regarding whether the affidavit supporting a search warrant contained information that was knowingly, intentionally, and deliberately deceiving [223].

No substantial likelihood of a miscarriage of justice arose from the prosecutor's closing argument at a criminal trial, where the prosecutor's statements were fair inferences drawn from the evidence, and where the judge instructed the jury that statements made during closing arguments were not evidence. [223-225]

There was no merit to the argument that, at the trial of indictments charging unlawful possession of a firearm and unlawful possession of a firearm or ammunition without an identification card, the judge was required to instruct the jury that the Commonwealth was required to prove that the defendant did not possess the requisite license and firearm identification card. [225-226]

This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree to manslaughter or to grant a new trial. [226]

INDICTMENTS found and returned in the Superior Court Department on July 30, 1999.

A pretrial motion to suppress evidence was heard by *Constance M. Sweeney,* J.; the cases were tried before *Daniel A.*

*Ford*, J., a motion for a required finding of not guilty or for a new trial was heard by him, and a motion for a new trial, filed on August 25, 2005, was also heard by him.

*Janet H. Pumphrey* for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. In June, 2001, the defendant, Raymond Colon, was found guilty of murder in the first degree on the theory of deliberate premeditation.[1] He also was found guilty of unlawful possession of a firearm, G. L. c. 269, § 10 (*a*) and (*d*), and unlawful possession of a firearm or ammunition without an identification card, G. L. c. 269, § 10 (*h*).[2] The defendant appealed. He filed a "renewed motion" for a required finding of not guilty (or alternatively for a new trial) pursuant to Mass. R. Crim. P. 25 (b), 378 Mass. 896 (1979), which was denied. In 2005, the defendant filed a motion for a new trial pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), which the trial judge denied. The defendant appealed. In his appeal, through new counsel, he claims that his motion to suppress should have been granted, his trial counsel provided ineffective assistance, and the prosecutor argued facts not in evidence during closing argument. In a pro se brief, see *Commonwealth* v. *Moffett*, 383 Mass. 201, 207-209 (1981), the defendant claims ineffective assistance of counsel and error in the jury instructions on the weapons charges. Through counsel, the defendant further requests that we exercise our authority under G. L. c. 278, § 33E, to reduce his conviction to manslaughter or grant a new trial. Because we conclude that the defendant's claims of error are without merit or do not create a substantial likelihood of a miscarriage of justice and discern no basis to grant relief under G. L. c. 278, § 33E, we affirm his convictions and the denial of his motion for a new trial.[3]

*Background. 1. The Commonwealth's case.* We summarize

---

[1]The jury found the defendant not guilty on the theory of extreme atrocity or cruelty.

[2]The indictment charging unlawful possession of a firearm, G. L. c. 269, § 10 (*a*) and (*d*), included a charge of a second offense. The Commonwealth filed a nolle prosequi as to the second offense portion of that charge.

[3]The defendant's motion for a new trial did not raise any additional claims that he has not raised directly on appeal through counsel or in his pro se brief.

the facts that the jury were warranted in finding, reserving certain details for our discussion of the issues. Prior to the murder on July 7, 1999, the defendant and the victim had been friends and partners in a drug-dealing operation in Holyoke. However, "bad blood" developed between them resulting from a dispute over money that the defendant allegedly owed the victim.

At approximately 3 P.M. on July 7, the victim was speaking with his girl friend, who was standing in front of 132 Sargeant Street in Holyoke. The defendant and his brother Eliott drove by and gave the victim a "hard look." Although it is not entirely clear from the record, it is important to note that the intersection of Chestnut Street and Sargeant Street is near 132 Sargeant Street, and there is a park across from 132 Sargeant Street, on the opposite side of Chestnut Street.

At some point that same day, the victim and two other people drove down Sargeant Street in a Toyota automobile and parked on the corner of Sargeant and Chestnut Streets. At that time, two of the defendant's brothers, David and Eliott, also appeared on Sargeant Street, carrying baseball bats. They approached the car and started swinging the bats. The victim got out of the vehicle and started backing up toward the park, telling David and Eliott to "chill" and to put their bats down so that he could fight them. Eliott advanced toward the victim, and one of the victim's companions, whose nickname was Flaco, pulled out a knife. David and Eliott told Flaco that "this thing" did not have to do with him and to get out of the way, which Flaco did. The victim had his hands in the air, and he was not holding anything. David and Eliott followed him into the park. The victim was in the park arguing with David and Eliott when the defendant entered the park. The victim's hands were still empty. When the defendant pulled a revolver out of his waistband, the victim ran. The defendant advanced on the victim and shot him from a distance of approximately five feet.

After the first shot, the victim grabbed his side and attempted to run away, but the defendant shot him two more times. The victim sustained gunshot wounds to his back, arm, and thigh. The victim ran out of the park and into the apartment of Pedro Gonzalez, a mutual friend of the defendant and the victim,

which was located on the fourth floor of 304 Chestnut Street, where he collapsed on the floor. The bullet that entered the victim's back and passed through his chest was ultimately fatal.

Police learned that the defendant and his brothers were seen running into 306 Chestnut Street. At approximately 7 P.M. they found the defendant (and his brothers) inside the defendant's girl friend's apartment, and the defendant was taken into custody. The defendant made statements to the police at the time of his arrest to the effect that he was the shooter and that his brothers had not shot the victim. Police secured the apartment and returned during the early morning hours of July 8 with a search warrant. They recovered a revolver, an aluminum baseball bat, and a broken baseball bat. The gun and photographs of the bats were admitted in evidence at trial along with a spent projectile recovered from the second-floor landing at 304 Chestnut Street. The projectile matched the gun that was recovered.

2. *The defendant's case.* At trial, the defendant did not deny shooting the victim. However, he claimed he was acting in self-defense and in defense of his brothers. We view the evidence pertinent to self-defense and defense of others in the light most favorable to the defendant. See *Commonwealth v. Brum*, 441 Mass. 199, 204 (2004); *Commonwealth v. Pike*, 428 Mass. 393, 395 (1998).

The defendant's trial testimony consisted of two parts. The first part concerned his relationship with the victim and the victim's history of violent behavior. The defendant met the victim in 1995 and became involved in the victim's drug business. The victim, who was described at trial as a "big man" who was over six feet tall, controlled "his area" of Holyoke through fear by beating up people who attempted to encroach on it. The defendant witnessed several of the beatings, including the beating of Francisco Marrerro, who was called as a cor-roborating witness. The victim owned several handguns, which were stored in a "ceiling trap" located on the fourth-floor land-ing of 304 Chestnut Street, near the apartment where Gonzalez lived.[4] After the tension arose between the defendant and the

---

[4] It is not clear from the record why the victim's guns were stored at 304 Chestnut Street. The defendant testified that he, the victim, and Gonzalez had access to the guns stored there.

victim, the defendant began sneaking into his girl friend's apartment when he visited in order to avoid a confrontation with the victim.

The defendant saw the victim in May, 1999, and an argument ensued, during which the victim punched the defendant in the face and continued to hit him until a friend broke up the fight. The defendant did not hit the victim during the fight. The defendant again avoided the victim but, on July 4, he encountered the victim while driving down Chestnut Street. The victim told the defendant, "Get out the car so I can whip your ass like I did your brother," and that he would "whip both of your asses." One witness testified that on July 4, the victim told her that he was going to shoot the defendant's brother and make the defendant watch.

The second part of the defendant's testimony concerned events on the day of the murder. The defendant testified that on the afternoon of July 7, he encountered the victim on Commercial Street in Holyoke. Both men were driving automobiles, and the victim began to chase the defendant until the vehicle the defendant was driving crashed into another vehicle. Later that afternoon, the defendant and his brothers walked to 304 Chestnut Street to speak with Gonzalez about contacting a mutual acquaintance of the victim and defendant, who the defendant thought could resolve the animosity between them. The defendant entered Gonzalez's apartment and gave Gonzalez the acquaintance's pager number. Gonzalez testified that he realized that the defendant was planning to confront the victim, and he tried to talk the defendant out of doing so by telling the defendant that the victim was armed. Gonzalez tried the pager number more than once, but received no response. While Gonzalez was making the telephone calls, the defendant went into the hallway and took a gun from the storage area in the ceiling. The defendant entered Gonzalez's bedroom and placed the gun on Gonzalez's dresser.

The defendant then looked out the window and saw that a fight was developing between his brothers and the victim. The defendant asked Gonzalez what type of gun the victim had, and Gonzalez responded that he did not know. The defendant again

asked Gonzalez if he was sure the victim was armed, and Gonzalez answered affirmatively. The defendant put the gun that he had obtained in his waistband and went outside.

He testified that he saw Flaco standing between the victim and Eliott with a knife and told Flaco to put the knife down. He stated that he was leading Eliott away from the victim. He also testified that he heard the victim say to his brothers, "I'm going to whip all of your asses." The victim started walking toward the defendant, saying, "Motherfucker, I'm going to blow your ass away." The defendant backed up. The victim reached for the door of his car, and the defendant, because he had been told that the victim was armed, assumed he was going for a gun. The defendant pulled out his gun and shot the victim.

Gonzalez testified that when the wounded victim entered his apartment, he asked Gonzalez to "get his gun." Gonzalez testified that he was loading the gun when the victim collapsed.

3. *Rebuttal.* The Commonwealth called three witnesses in rebuttal who all provided testimony about the car crash in which the defendant was involved during the afternoon of July 7, suggesting that there was not another vehicle close behind the defendant's car prior to the crash and that the damage to the defendant's car was not serious.

*Discussion.* 1. *Denial of the defendant's motion to suppress.* Before trial, the defendant filed a motion to suppress statements and physical evidence obtained as a result of the police entry into his girl friend's apartment at 306 Chestnut Street. The motion was denied by a judge, who was not the trial judge. The judge issued oral findings to support her conclusion that the defendant did not have a reasonable expectation of privacy in the apartment; that two statements — one oral and one written — that the defendant made on July 7 were voluntary and admissible; and that the Commonwealth had probable cause to arrest the defendant.[5] The defendant challenges both the warrantless

[5]The defendant filed a second motion to suppress the statements of July 7, as well as statements made July 8 and 10. After an evidentiary hearing, the judge issued written findings concerning the July 8 and 10 statements. The judge denied the defendant's motion to suppress statements he made to a jail classification employee, but allowed the motion concerning the defendant's statement to a jail classification supervisor, who admitted that he questioned

entry into his girl friend's apartment that resulted in his arrest and the validity of the warrant issued for the subsequent search of the apartment.

Concerning the warrantless entry, the defendant argues that his motion to suppress should have been granted because he had a reasonable expectation of privacy in his girl friend's apartment, and there was no exigency justifying the warrantless entry.[6] We conclude that the motion judge did not err in denying the motion to suppress the warrantless entry because the defendant did not have a reasonable expectation of privacy in his girl friend's apartment.[7]

A search in the constitutional sense occurs only when police conduct has intruded on a constitutionally protected reasonable expectation of privacy. *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991), citing *Commonwealth* v. *Frazier*, 410 Mass. 235, 244 n.3 (1991). The defendant has the burden of demonstrating that he had a reasonable expectation of privacy in his girl friend's apartment. See *Commonwealth* v. *Netto*, 438 Mass. 686, 697 (2003).

> "In evaluating the reasonableness of an individual's expectation of privacy, we look to a number of factors, including the character of the location involved. *Commonwealth* v. *Pina*, 406 Mass. 540, 545 [, cert. denied, 498 U.S. 832] (1990). Thus, we consider whether the defendant owned the place involved, *Rawlings* v. *Kentucky*,

the defendant to try to get another confession from him. The defendant's statements to the jail classification employee were never introduced into evidence at trial, and the defendant does not challenge the judge's ruling in his brief.

[6]The exigency issue was not raised at the motion hearing. In addition, the motion judge denied the defendant's motion to hold an evidentiary hearing on whether there was probable cause to arrest the defendant.

[7]In his motion for a new trial, the defendant argued that the motion to suppress was erroneously denied. The judge did not consider this issue because it would have required him to review findings and rulings by the motion judge. Likewise, the judge did not consider two of the defendant's ineffective assistance of counsel claims (failing to request a manslaughter instruction based on reasonable provocation and failing to object to the prosecutor's closing argument), concluding that the defendant could raise them on direct appeal where he would receive more favorable review under the substantial likelihood of a miscarriage of justice standard. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

448 U.S. 98, 104 (1980); *Commonwealth* v. *Mora*, 402 Mass. 262, 265 (1988); whether the defendant controlled access to the area, *Commonwealth* v. *D'Onofrio*, 396 Mass. 711, 717 (1986); and whether the area was freely accessible to others, *Sullivan* v. *District Court of Hampshire*, [384 Mass. 736, 742 (1981)]. We have stated that 'an individual can have only a very limited expectation of privacy with respect to an area used routinely by others.' *Id.*"

*Commonwealth* v. *Montanez, supra* at 301-302. Even where an individual is a long-term guest in a home, and lives in his own bedroom in the home, he has only a "very limited expectation of privacy," that terminates when the individual abandons the room. *Commonwealth* v. *Mallory*, 56 Mass. App. Ct. 153, 154, 157-158 (2002), quoting *Commonwealth* v. *Montanez, supra.* See *Commonwealth* v. *Welch*, 420 Mass. 646, 654 (1995) (no expectation of privacy where individual shared room in common with others and lacked authority to exclude others from room).

In reviewing a ruling on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). Here, we recite the facts the motion judge found and add, as necessary, uncontested facts from the record of the motion hearing. *Commonwealth* v. *Koumaris*, 440 Mass. 405, 408 (2003).

Marilyn Nunez, the occupant of 306 Chestnut Street, apartment no. 207, was the defendant's girl friend and the mother of his children. Although the defendant might have resided at 306 Chestnut Street for some period of time during 1999, by July he was no longer living in the apartment. His primary residence at the time of the shooting was on Pleasant Street in Holyoke, and his secondary residence was in the Flats section of Holyoke. During this period, the defendant did go to Nunez's apartment to babysit his children, and occasionally to engage in an intimate relationship with Nunez. The defendant did not stay overnight at 306 Chestnut Street on July 6, and had not stayed overnight at the apartment since the night of July 1.

On July 7, police entered the apartment after receiving information that the person who shot the victim had run into the building after the shooting. Police arrested the defendant in the apartment. The defendant told police that he and his brothers had known that Nunez's back door was open, so they entered. When Nunez returned to her apartment building and heard that people were hiding in her apartment, she stated to police, "What are they doing here? They don't have a right to be here."[8] After police obtained the search warrant for the apartment and conducted their search, neither clothing nor documents belonging to the defendant were found in Nunez's apartment.

At the hearing, Nunez testified that the defendant slept at her apartment three or four nights a week; had her permission to be in the apartment when she was not home; kept clothing, papers, and music articles there; received mail there; had keys to the apartment; and occasionally paid Nunez money for rent. However, the motion judge found that Nunez's testimony was not credible.

We reject the defendant's claim that the motion judge's finding as to the credibility of Nunez's testimony was clearly erroneous. A judge's finding is clearly erroneous only where there is no evidence to support it or where the reviewing court is left with the "definite and firm conviction that a mistake has been committed." *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). Here, the motion judge provided substantial support for her conclusion that Nunez's testimony was not credible, stating that her testimony "on numerous essential points directly contradicts statements and acts and certifications she has made on prior occasions," and that "it is inherently inconsistent on almost every essential point before the court." Moreover, "[t]he determination of the weight and credibility of the testimony [at a motion to suppress hearing] is the function and responsibility of the judge who saw and heard the witnesses, and not of this court." *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). Where there is conflicting testimony, a judge's resolution of the conflicting testimony

---

[8]At the motion hearing, Nunez denied making this statement to police.

"invariably will be accepted." *Commonwealth* v. *Spagnolo,* 17 Mass. App. Ct. 516, 517-518 (1984). There was no error.

The defendant also testified at the motion hearing. However, his testimony did not demonstrate that the apartment was his. He also did not demonstrate that he controlled access to any part of the apartment, and it is clear that the entirety of the apartment was freely accessible to Nunez and her children. Furthermore, even if the defendant had a reasonable expectation of privacy in Nunez's apartment while he was staying there as an overnight guest, see *Minnesota* v. *Olson,* 495 U.S. 91, 100 (1990), he lost that expectation after July 2, 1999, because, according to his own testimony, he stopped staying overnight at the apartment. Thus none of the defendant's assertions, through his own or Nunez's testimony (i.e., that he had a right to be in the apartment, that he spent time there alone with his children and provided care to them there, that he shared the bed in the apartment with his girl friend, that his immediate family lived there, and that he slept there three to four nights a week), provided him with a reasonable expectation of privacy on July 7.

Although the defendant's motion to suppress stated that the Commonwealth could not prove that there was no legally cognizable exception to the warrant requirement present when the police arrested him, it was not considered by the motion judge once she determined that he had no reasonable expectation of privacy. The defendant now claims that there were no exigent circumstances justifying the warrantless entry into the apartment. Although we need not address this issue in light of our conclusion that the defendant had no reasonable expectation of privacy in the apartment, we note that even if he had such an expectation, exigent circumstances permitted a warrantless entry into the premises. "Exigencies which may justify a procedure without warrant are a narrow category and must be established by the Commonwealth which bears the burden of proof." *Commonwealth* v. *Young,* 382 Mass. 448, 456 (1981). To meet this burden, the Commonwealth must show that "the authorities had reasonable ground to believe that an exigency existed," and their actions were "reasonable under the circumstances." *Commonwealth* v. *Morrison,* 429 Mass. 511, 515 (1999), quoting

*Commonwealth* v. *Marchione*, 384 Mass. 8, 10-11 (1981). Reasonableness must be "evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *Young, supra.* Here, the officers were told by a witness that she had seen the shooting and that the defendant and his brothers had run into the building.[9] The officers knocked on the apartment door. Although no one answered, they heard noise inside the apartment. From the perspective of the responding officers, this information alone made their conclusion that exigent circumstances existed more than reasonable. In addition, there was the possibility that evidence could have been destroyed and that the defendant would have been aware of police presence. See *Commonwealth* v. *Garner*, 59 Mass. App. Ct. 350, 364-366 (2003) (exigent circumstances where crime involved violence, police pursued suspect, and delay in getting warrant could endanger police officers or others and evidence could be destroyed). See also *Commonwealth* v. *Huffman*, 385 Mass. 122, 125 n.6 (1982) (exigency may arise if suspect becomes aware of police officers' presence).

Concerning the search warrant, the defendant argues that the motion judge erred in holding that he did not have automatic standing to challenge the search warrant because his firearms-related charges were based on his possession of the firearm and ammunition at the time the victim was killed, not whether the firearm was in the apartment, and that the defendant had no reasonable expectation of privacy in the girl friend's apartment. See generally *Commonwealth* v. *Carter*, 424 Mass. 409, 411 & n.3 (1997), and cases cited (even with automatic standing, where defendant not charged with constructive possession, court determines whether there was reasonable expectation of privacy). We need not decide whether the defendant had auto-

---

[9]We "supplement a judge's findings of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), and cases cited. Here it is clear that the judge credited the relevant testimony, because when she found probable cause to arrest the defendant, she credited the testimony of the police officer who said that a witness reported that she saw the defendant and his brothers enter the apartment building.

matic standing to challenge the search warrant concerning the firearms charges, because even if he did, there was adequate probable cause to support the warrant.[10] The police found and arrested the defendant in the apartment and his statements indicated that he had shot the victim. The police had probable cause to believe that relevant evidence could be in the apartment from the defendant's statement and from the statement of an eyewitness.

2. *Ineffective assistance of counsel.* The defendant alleges that trial counsel was ineffective in abandoning his argument that he was acting in defense of others, failing to request a manslaughter instruction on the basis of provocation, and failing to request a *Franks* hearing, see *Franks* v. *Delaware*, 438 U.S. 154 (1978).[11]

Because we review this case under G. L. c. 278, § 33E, we examine the defendant's claims of ineffective assistance of counsel under the more favorable substantial likelihood of a miscarriage of justice standard. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). For each claim, we consider whether there was an error by defense counsel during the trial, and if there was, whether that error was likely to have influenced the jury's conclusions. *Id.*

a. *Defense of others.* In his opening statement, defense counsel stated that the defendant shot the victim in an attempt to "defend his brothers who he thought were in [danger of] grave bodily harm [by the victim]." He further commented that the evidence would show that the defendant had acted "only in

---

[10]Even assuming that the defendant has automatic standing to challenge the search of his girl friend's apartment on the two firearms-related indictments, *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991), he would not have automatic standing to challenge the search as it pertains to the charge of murder, because murder is not a crime "where possession is an essential element of the charge." *Id.*

[11]The defendant claims that the prosecutor argued facts not in evidence in her closing argument. In the alternative, he argues that his counsel's failure to object to this alleged error constituted ineffective assistance. Because the standard of review of the alleged error and ineffective assistance claim is the same, we address this claim where we discuss the issue substantively. See part 3, *infra.* See *Commonwealth* v. *Wilson*, 443 Mass. 122, 131 n.18 (2004), citing *Commonwealth* v. *Carmona*, 428 Mass. 268, 274 (1998) ("The ineffective assistance of counsel claim adds nothing as, in these circumstances, we look to see whether there is a substantial likelihood of a miscarriage of justice").

the defense of his brothers in taking the action that he did." The defendant contends that trial counsel failed to follow through on the defense of others theory during direct examination of one of the defendant's witnesses and in his closing argument.

Defense counsel elicited testimony from a witness that the victim had told her that he intended to kill the defendant's brother and make the defendant watch. However, counsel did not ask the witness whether the defendant knew about this statement, and did not specifically discuss the defense of others theory during his closing argument.

Concerning the failure to ask the witness whether the defendant knew of the threat, we need not decide whether this was error, because even if it were, there is no substantial likelihood of a miscarriage of justice where the testimony was cumulative.[12] The jury heard evidence of similar threats from the victim that the defendant knew about, including testimony from the defendant himself that on July 4 the victim confronted him and his brother and told the defendant, "Get out the car so I can whip your ass like I did your brother," and threatened to "whip both of your asses." See *Commonwealth* v. *Britto*, 433 Mass. 596, 602 (2001) (testimony of two witnesses not called by defense counsel "merely cumulative" of other testimony). In addition, the jury heard testimony that the defendant was told, immediately before the shooting, that the victim was armed, as well as the defendant's testimony that when he confronted the victim on the street, the victim said that he would "whip all your asses" and "blow your ass away."

Concerning counsel's failure to discuss the defense of others theory during closing argument, counsel did mention the threat that the victim made to shoot the defendant's brother in front of him, and that the defendant was afraid for himself and his brothers. Not spending more time on the issue was reasonable given the meager amount of evidence admitted at trial supporting the defense, particularly in light of the fact that the brothers

---

[12]Defense counsel sought to elicit testimony that the defendant knew about the victim's threat during the direct examination of the defendant, but the judge excluded it upon the prosecutor's objection. At a bench conference, defense counsel then stated his intention to show the defendant's knowledge of the threat through the witness who heard the threat, but he did not pose that particular question to the witness on direct examination.

were confronting the victim armed with baseball bats. See *Commonwealth* v. *Anderson*, 445 Mass. 195, 211 (2005), quoting *Commonwealth* v. *Finstein*, 426 Mass. 200, 203 (1997) ("An attorney's strategic decisions are not errors unless shown to be 'manifestly unreasonable' "). Moreover, the jury were instructed on self-defense and defense of others. Given this context, we conclude that the jury were not influenced by errors, if any, that counsel made.

b. *Manslaughter instruction.* In addition to instructing the jury on murder in the first degree and murder in the second degree, the judge instructed the jury that they could find the defendant guilty of voluntary manslaughter if they found that he used excessive force in self-defense. The defendant now claims that defense counsel was ineffective for failing to request an instruction on voluntary manslaughter on the basis of provocation.

Voluntary manslaughter on the theory of provocation "has been defined as a killing committed in 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987), quoting *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). A voluntary manslaughter instruction based on provocation is appropriate "if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). Provocation and "cooling off" time must meet both a subjective and an objective standard. See *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001). A manslaughter instruction must be given if any view of the evidence would permit a verdict of manslaughter rather than murder, *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996), but "the judge may not charge on a hypothesis not supported by the evidence." *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975). We conclude that no view of the evidence introduced at trial would support an instruction on manslaughter based on provocation.

The defendant claims that the victim chased him in his car less than one hour before the incident, and that he did not have sufficient time for his temper to cool prior to the shooting. This argument has no merit. It is not clear that the car chase alone would constitute adequate provocation. *Commonwealth* v. *Vatcher*, 438 Mass. 584, 589 (2003) ("a victim's offensive use of physical force against a defendant will not necessarily constitute 'adequate provocation' "). However, assuming that the car chase could constitute provocation, and that the record supports a short time frame between the car chase and the murder,[13] our case law is clear that where the alleged provocation is followed by at least a few minutes during which the defendant and the victim are separated, and then the defendant seeks out the victim, a charge of voluntary manslaughter based on provocation is not warranted. See *Commonwealth* v. *Keohane*, 444 Mass. 563, 568 (2005) ("even where sufficient provocation exists, if a defendant leaves the scene of the provocation [as here] and then returns to attack the victim, the defendant is considered to have had adequate opportunity for his anger to subside")[14]; *Commonwealth* v. *Amaral*, 389 Mass. 184, 189 (1983) ("Even if we assume that the shoving incident minutes before the shooting could create reasonable provocation, any threat to the defendant stemming from the shoving incident disappeared when the defendant left the scene"); *Commonwealth* v. *Coleman*, 366 Mass. 705, 707-708, 715 (1975).

Here, the defendant left the car chase and drove to his mother's house, went upstairs, retrieved an address book, walked with his brothers (who were carrying bats) from his mother's house to Gonzalez's apartment,[15] had a conversation with Gonzalez, procured a gun from the "trap" in the hallway ceiling, returned

---

[13]Neither the defendant's testimony nor the testimony of any of his witnesses placed a specific time frame on the car incident or the shooting. However, viewing the evidence presented by the defendant in conjunction with the Commonwealth's evidence, we could conclude that there was less than one hour between the car chase and the shooting.

[14]"A defendant's sudden discovery of ongoing spousal infidelity seems to be an exception that may warrant a longer 'cooling off' period." *Commonwealth* v. *Keohane*, 444 Mass. 563, 568 n.4 (2005), citing *Commonwealth* v. *Andrade*, 422 Mass. 236, 238 (1996).

[15]The distance that the defendant walked appears to be approximately one mile.

to Gonzalez's bedroom, saw the victim from the window with his brother Eliott "going towards him," ran and grabbed the gun, and then went outside to confront the victim.

The defendant did not offer any evidence that the victim struck the defendant, or his brothers, immediately prior to the shooting. Cf. *Commonwealth* v. *Lapage*, 435 Mass. 480, 486 (2001) (sufficient evidence for jury instruction on provocation where there was evidence "that the victim was the first to strike, that she previously had been violent toward the defendant, that no avenue of retreat was available to the defendant, and evidence that would permit the jury to find the whole episode stemmed from a volatile, unexpected confrontation").

The only evidence of immediate provocation that was presented at trial were oral statements that the defendant testified the victim made to the defendants' brothers that he was going to "whip all of your asses" and his statement to the defendant, "Motherfucker, I'm going to blow your ass away." The defendant does not contend in his brief that this constituted provocation, and generally, "words alone do not give rise to adequate provocation." *Commonwealth* v. *Groome, supra.* The defendant acknowledged that the victim's hands were in front of him when he made this statement and that he was not holding a weapon, although the defendant testified that he believed that the victim was "going for a gun" in his car.

Only incidents immediately preceding the shooting can constitute reasonable provocation. *Commonwealth* v. *Amaral, supra* at 188. Therefore, the defendant's attempt to argue provocation based on the evidence of a history of prior hostilities between the victim and the defendant is unavailing.

Finally, the focus of the defendant's case was self-defense. He testified that he shot the victim because he had been told that the victim was armed and he thought he was "going for a gun." A defendant's claim that he acted in self-defense, based on "asserting the defendant's calculus of survival, not any blindness of heat of passion on reasonable provocation" undercuts his contention that he acted on heat of passion or provocation. *Commonwealth* v. *Vinton*, 432 Mass. 180, 189 (2000). See *Commonwealth* v. *Niemic*, 427 Mass. 718, 721-722 & n.1 (1998). There was no error.

c. *Failure to request* Franks *hearing.* In his pro se brief, the defendant claims that his trial counsel erred in failing to request a pretrial hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978). The defendant alleges that the affidavit supporting the search warrant contained the following information that was "knowingly, intentionally, and deliberately deceiving": (1) the statement that at least one eyewitness observed the Colon brothers enter the building and then the apartment; (2) the conclusion that there was an exigency; (3) the insinuation that Norma Malave was the eyewitness who observed the defendant and his brothers run into the apartment; (4) the insinuation that an unknown woman and her two small children were present in the apartment; and (5) the substitution of portions of what Norma Malave told the police with what her mother told the police.[16]

In order to obtain a *Franks* hearing, a defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause." *Franks* v. *Delaware, supra* at 155-156. We agree with the judge who denied the defendant's motion for a new trial that nothing in the record, including the documents that the defendant cites in his brief, provides any basis for a showing of knowing and intentional false statements or reckless disregard for the truth. Because the defendant has not shown that a motion for a *Franks* hearing would have been successful, counsel was not ineffective for failing to request one.

3. *Prosecutor's closing.* The defendant contends that the Commonwealth argued facts not in evidence during closing argument by painting the defendant as a "ruthless drug dealer who would kill to obtain his own 'corner.' " Because the defendant did not object on these grounds at trial, we review this claim for a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Gaynor*, 443 Mass. 245, 271 (2005).

The portions of the Commonwealth's closing argument that the defendant challenges are statements referring to the defendant

---

[16]In his pro se brief, the defendant's argument concerning the propriety of the affidavit in support of the search warrant is entwined with an argument about exigent circumstances.

as a drug dealer and commenting that he was trying to use the life of a drug dealer as a defense for murder, suggestions that the defendant's motive for killing the victim was a desire to take over the victim's drug business and collect the victim's share of the drug earnings, an estimation that the defendant would earn $312,500 per year if he collected both his and the victim's income from drug dealing, and remarks suggesting that the shooting was a drug war over turf that implied that the Commonwealth had more evidence that it did not introduce.

Prosecutors may not misstate the evidence or refer to facts not in evidence. *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). However, they may "argue from the evidence and may argue fair inferences that might be drawn from the evidence." *Commonwealth* v. *Murchison*, 418 Mass. 58, 59 (1994). "Arguments based on testimony submitted at trial and its logical conclusions are proper . . . ." *Commonwealth* v. *Freeman*, 430 Mass. 111, 118 (1999). See *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984) (prosecutor's comments viewed in light of entire argument).

Although the defendant correctly points out that there was no direct evidence conclusively establishing the motive that the prosecutor described, the prosecutor's statements were fair inferences drawn from the evidence. The defendant himself testified that he had been a drug dealer and that he started dealing drugs because he saw it as a financial opportunity. He stated that he made on average $500 per day from his involvement in drug dealing; the victim made approximately $750 per day and controlled the block of Holyoke where the defendant worked for him. The defendant further testified that he had been involved in a financial dispute with the victim over money obtained through the drug-dealing operation, and that as a result of the dispute, the defendant no longer made money from the drug operation. Moreover, the defendant and Gonzalez testified that the acquaintance the defendant had Gonzalez try to reach to stop the tension between the defendant and the victim was a "drug connection" with whom they had a relationship.

In light of this testimony, all of the factual assertions the defendant points to as improper were supported by the evidence admitted or based on logical inferences drawn therefrom.

Contrast *Commonwealth* v. *Griffith*, 45 Mass. App. Ct. 784, 787 (1998) (remarks that defendant was "entrepreneur" and "common street level dealer" unsupported by evidence). The prosecutor's statements did not amount to unsworn testimony, as the defendant suggests.

In addition, the judge instructed the jury that motive is not an essential element of murder in the first degree.[17] See *Commonwealth* v. *Perez*, 444 Mass. 143, 152 (2005); *Commonwealth* v. *Lucien*, 440 Mass. 658, 666 (2004). Furthermore, the judge instructed the jury that statements during closing arguments were not evidence.[18] See *Commonwealth* v. *Kozec, supra* at 517. There was no error.

4. *Jury instructions.* In his pro se brief, *Commonwealth* v. *Moffett*, 383 Mass. 201, 207-209 (1981), the defendant claims that he was denied due process because the judge's instructions to the jury concerning the elements of two firearms charges did not require the Commonwealth to prove that the defendant did not possess the requisite license and firearm identification card. This argument has no merit.[19]

General Laws c. 269, § 10 (*a*), prohibits knowing possession

---

[17]The defendant's contention that the jury believed the prosecutor's theory of the defendant's motive is, therefore, unsupported. The jury need not have found any motive on the part of the defendant in order to convict him of murder in the first degree.

[18]The defendant argues that a "boilerplate instruction" was not enough in this case to counter the prosecutor's argument, especially where the judge told the jury that closing arguments were "very well done by both sides." The defendant takes the judge's statement out of context:

> "So I stress to you that it is your function to find the facts and nobody, not the judge, or the attorneys, or anybody else, may interfere with that function. So if, for example, in the course of final arguments, and arguments are helpful and appropriate and in this case I thought very well done by both sides, but if in the course of final arguments either attorney gave you an impression as to how he or she thinks that you ought to find the facts, or expressed his or her own personal opinions to you, or talked about things that you don't recall from the testimony, then ignore it, because it is your collective memory of the testimony that controls."

[19]The Commonwealth asserts that, because the defendant did not raise this argument at trial or in his motion for a new trial, it is not properly before this court. We review this claim to determine whether there was a substantial likelihood of a miscarriage of justice.

of a firearm without a license. General Laws c. 269, § 10 (*h*), prohibits possession of a firearm or ammunition without a firearm identification card. We have held that, in prosecutions under these provisions, the Commonwealth does not need to present evidence to show that the defendant did not have a license or firearm identification card because " 'the burden is on the defendant' to come forward" with such evidence. *Commonwealth* v. *Tuitt*, 393 Mass. 801, 810 (1985), quoting *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977).[20] *Commonwealth* v. *Parzick*, 64 Mass. App. Ct. 846, 851 (2005). We have held further that the presumption that the defendant is not authorized to carry a firearm is constitutional. See *Commonwealth* v. *Jones*, *supra* at 404, 407-409. Moreover, the defendant's contention — that it should be the Commonwealth's burden to prove a lack of license or a firearm identification card because they are essential elements of the crimes charged — has been rejected. See *id.* at 406 ("Absence of a license is not 'an element of the crimes,' as that phrase is commonly used").

5. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record to determine whether the verdict is against the law or the weight of the evidence for any reason justice may require, and we conclude that there is no reason to exercise our authority under G. L. c. 278, § 33E, to reduce the verdict to manslaughter or to grant a new trial.

> *Judgments affirmed.*
>
> *Order denying motion for a new trial affirmed.*

---

[20]*Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977), interpreted G. L. c. 278, § 7, as it applies to G. L. c. 269, § 10 (*a*). General Laws c. 278, § 7, states that "[a] defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized."